## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO

| | | |
|---|---|---|
| **AMARK LOGISTICS, INC.** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **Civil Action No.:** |
| | ) | |
| **UPS GROUND FREIGHT, INC.** | ) | **NOTICE OF REMOVAL** |
| **d/b/a UPS FREIGHT LTL** | ) | **PURSUANT TO:** |
| **TRANSPORTATION** | ) | **28 U.S.C. § 1331;** |
| | ) | **49 U.S.C. § 14706;** |
| Defendant. | ) | **28 U.S.C § 1337; AND,** |
| | ) | **28 U.S.C. § 1441.** |
| | ) | |

## NOTICE OF REMOVAL

UPS Ground Freight, Inc. d/b/a UPS Freight LTL Transportation ("Defendant") a Federally authorized motor carrier of goods in interstate commerce being licensed by the Federal Motor Carrier Safety Administration and pursuant to 28 U.S.C. §§ 1331, 1337(b) and 49 U.S.C. § 14706 hereby gives notice of the removal of this case to the United States District Court for the Northern District of Ohio.

Defendant states the following as grounds for removal.

## PROCEDURAL STATUS OF THE CASE

1.  On or about October 14, 2019 plaintiff commenced this action by filing a Complaint in the Court of Common Pleas, Cuyahoga County, Ohio. The suit was assigned Case No. CV 19 923257. See Exhibit "A," attached hereto a true and accurate copy of the Plaintiff's Complaint with attachments thereto and the Summons.

2.      Defendant was served with the Summons and Complaint on October 17, 2019, which was the first notice Defendant had of the existence of this lawsuit.

## BACKGROUND

3.      Plaintiff's Complaint alleges a cause of action pursuant to the Carmack Amendment to the Interstate Commerce Act, 49 U.S.C. § 14706 (Count Two), which exclusively governs allegations of damage to goods shipped in interstate commerce.  Plaintiff also asserts state-created causes of action such as breach of contract (Count One) and negligence (Count Two), which state-created causes of action are barred and preempted by federal law.  Plaintiff alleges damages in the amount of $25,000.00 on Count Two, $21,835.58 on Count One and $25,000.00 on Count Three, all in connection with allegations of damage to goods transported in interstate commerce from Arkansas to California.  See Complaint, Wherefore Clause, pg. 9.

4.      Because Defendant is a motor carrier of goods in interstate commerce, the allegations against Defendant are exclusively governed by federal law, namely the Carmack Amendment to the Interstate Commerce Act, 49 U.S.C. § 14706.

5.      Pursuant to 28 U.S.C. § 1441, the entire action is removable.  Plaintiff specifically plead a cause of action pursuant to the Carmack Amendment to the Interstate Commerce Act, 49 U.S.C. § 14706.

## BASIS FOR FEDERAL COURT
## ORIGINAL JURISDICTION

6.      Plaintiff's claims for damage or loss to goods shipped in interstate commerce are governed exclusively by federal law, i.e., the Carmack Amendment to the Interstate Commerce Act.  See 49 U.S.C. § 14706.

7.      Pursuant to 28 U.S.C. § 1331, federal courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States.

8.      The Complaint makes allegations pursuant to federal law, i.e., the Carmack Amendment to the Interstate Commerce Act, 49 U.S.C. § 14706, for damage to goods transported in interstate commerce.  Plaintiff's additional state-created causes of action for negligence and breach of contract and barred and preempted by federal law.

9.      Because this action is governed by federal law, i.e., the Carmack Amendment to the Interstate Commerce Act, 49 U.S.C. § 14706, which, of course, is an Act of Congress, this Court has original jurisdiction over the claims alleged in plaintiff's Complaint pursuant to 28 U.S.C. § 1331.

10.      Moreover, because the amount alleged in the Complaint is greater than $10,000.00, the matter is also subject to removal pursuant to 28 U.S.C. § 1337(a).  See Exhibit "A," Complaint.

## PROPRIETY OF REMOVAL

11.      This Notice of Removal is timely filed because it is filed within thirty (30) days of Defendant's receipt of the Complaint, in accordance with 28 U.S.C. § 1446(b).

12.      This Court has original jurisdiction of this matter under 28 U.S.C. §§ 1331 and 1337(a).

13.      This matter is subject to removal pursuant to 28 U.S.C. § 1441.

14.      Removal of this matter is not barred by 28 U.S.C. § 1445.

15.      Pursuant to 28 U.S.C. § 1446(a), Defendant has attached hereto as Exhibit "A" a copy of the Summons and Complaint.

16.      Pursuant to 28 U.S.C. § 1441, the entire action is removable.

3

17.     Pursuant to 28 U.S.C. § 1446(a) and (d), Defendant will promptly file a copy of this Notice of Removal with the Clerk, Court of Common Pleas, Cuyahoga County, Ohio, will provide prompt notice to all adverse parties, and will file proof of service of all notices and filings with the Clerk of the United States District Court for the Northern District of Ohio.

**WHEREFORE**, Defendant removes the above-captioned action from the Court of Common Pleas, Cuyahoga County, Ohio, to the United States District Court for the Northern District of Ohio.

Respectfully submitted,

*/s/ Marshal M. Pitchford*
Marshal M. Pitchford (0071202)
mpitchford@dpylaw.com
DiCaudo, Pitchford & Yoder
209 South Main Street, Third Floor
Akron, OH 44308
Telephone: 330.762.7477
Facsimile: 330.762.8059

*Attorney for Defendant*

4

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and accurate copy of the foregoing **NOTICE**

**OF REMOVAL** has been filed electronically.  Notice of this filing will be sent to all parties by

operation of the Court's electronic filing system.  Parties may access this filing through the

Court's system.  A copy was served upon the following via regular U.S. Mail, postage prepaid

this 12th day of November, 2019:

> Eric J. Weiss, Esq.
> Spencer E. Krebs, Esq.
> Cavitch, Familo & Durkin Co., LPA
> 1300 East Ninth Street
> 20th Floor
> Cleveland, Ohio
> Counsel for Plaintiff

> Clerk,
> Cuyahoga County Court of Common Pleas
> Cuyahoga County Courthouse
> 1200 Ontario Street
> Cleveland, Ohio 44113

> _/s/ Marshal Pitchford_____
> Marshal Pitchford, Esq.

# EXHIBIT "A"



**NAILAH K. BYRD**
**CUYAHOGA COUNTY CLERK OF COURTS**
1200 Ontario Street
Cleveland, Ohio 44113

Court of Common Pleas

New Case Electronically Filed:
October 14, 2019 14:30

By: SPENCER E. KREBS 0097414

Confirmation Nbr. 1841679

AMARK LOGISTICS, INC.                          CV 19 923257

    vs.

UPS GROUND FREIGHT, INC., ET AL.     **Judge:** NANCY R. MCDONNELL

Pages Filed:  18

SUMMONS IN A CIVIL ACTION    COURT OF COMMON PLEAS, CUYAHOGA COUNTY JUSTICE CENTER
CLEVELAND, OHIO 44113

| CASE NO.<br>CV19923257 | D1 FX | SUMMONS NO.<br>40065544 |
| --- | --- | --- |

Rule 4 (B) Ohio

Rules of Civil
Procedure

| | |
| --- | --- |
| AMARK LOGISTICS, INC.<br>VS<br>UPS GROUND FREIGHT, INC | PLAINTIFF<br><br>DEFENDANT |

**SUMMONS**

UPS GROUND FREIGHT, INC. DBA UPS
FREIGHT LTL TRANSPORTATION
50 WEST BROAD ST STE 1330
COLUMBUS OH 43215-0000

You have been named defendant in a sums
complaint (copy attached hereto) filed in Cuyahoga
County Court of Common Pleas, Cuyahoga County
Justice Center, Cleveland, Ohio 44113, by the
plaintiff named herein.

You are hereby summoned and required to
answer the complaint within 28 days after service
of this summons upon you, exclusive of the day of
service.

Said answer is required to be served on:



Said answer is required to be served on Plaintiff's
Attorney (Address denoted by arrow at left.)

Plaintiff's Attorney

ERIC WEISS
1300 EAST NINTH ST., 20TH FL

CLEVELAND, OH 44114-0000

Your answer must also be filed with the court
within 3 days after service of said answer on
plaintiff's attorney.

If you fail to do so, judgment by default will be
rendered against you for the relief demanded in the
complaint.

Case has been assigned to Judge:

NANCY R MCDONNELL
Do not contact judge. Judge's name is given for
attorney's reference only.

NAILAH K. BYRD
Clerk of the Court of Common Pleas

| DATE SENT<br>Oct 16, 2019 | By_____<br>Deputy |
| --- | --- |

COMPLAINT FILED   10/14/2019

CMSN130

IN THE COURT OF COMMON PLEAS
CUYAHOGA COUNTY, OHIO

| | | |
|---|---|---|
| Amark Logistics, Inc. | ) | CASE NO.: |
| 28915 Clemens Road, Suite #200 | ) | |
| Westlake, Ohio 44145 | ) | JUDGE: |
| | ) | |
| Plaintiff, | ) | |
| -vs- | ) | |
| | ) | **COMPLAINT** |
| UPS GROUND FREIGHT, INC., | ) | (Jury Demand Endorsed Hereon) |
| d/b/a UPS Freight LTL Transportation | ) | |
| 1000 Semmes Avenue | ) | |
| Richmond, Virginia 23224 | ) | |
| | ) | |
| **AND ALSO TO:** | ) | |
| | ) | |
| 50 West Broad Street, Suite 1330 | ) | |
| Columbus, Ohio 43215, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

Plaintiff, Amark Logistics, Inc. ("Amark"), hereby states for its Complaint against

Defendant, UPS Ground Freight, Inc., d/b/a UPS Freight ("UPS"), as follows:

## NATURE OF THE CASE

1.     Plaintiff, Amark brings this action against UPS to recover damages for

certain goods that were damaged while in the care, custody and control of UPS.

Specifically, Amark engaged UPS to serve as a motor carrier and transport goods on

behalf of Amark. While in transit, goods were destroyed and are no longer saleable.

Amark seeks to recover the principal amount of$ 21,835.58 for the damaged goods. This

Complaint asserts the following causes of action against UPS for: (i) breach of contract,

(ii) violation of the Carmack Amendment, and (iii) negligence.

## PARTIES

2.      Plaintiff, Amark, is a corporation organized and existing under the laws of the State of Ohio.

3.      Amark is a logistics provider engaged in the business of providing services in connection with freight management, rate negotiation, carrier selection, equipment sourcing, and freight payment services. Amark's principle place of business is the address set forth in the caption of this Complaint.

4.      Upon information and belief, Defendant, UPS, is a corporation organized and existing under the laws of the State of Virginia. UPS is registered with the Ohio Secretary of State to do business in Ohio.

5.      UPS provides LTL and truckload freight transportation with locations throughout the United States.  Upon information and belief, UPS regularly transacts business in Ohio and throughout Cuyahoga County. In fact, UPS has shipment and distribution centers throughout Cuyahoga County.  UPS' principle place of business is the address set forth in the caption of the Complaint.

## JURISDICTION AND VENUE

6.      Jurisdiction is proper in Ohio pursuant to Ohio Revised Code 2307.382 (A)(1).

7.      Venue is proper in Cuyahoga County, Ohio pursuant to Ohio Civil Rule 3(B) (7).

Electronically Filed 10/14/2019 14 30 / / CV 19 923257 / Confirmation Nbr 1841679 / CLAJB

## GENERAL ALLEGATIONS

8.     On or about July 8, 2013, Amark and UPS entered into an agreement captioned "Broker/Carrier Master Transportation Agreement" (the "Master Agreement"), whereby UPS agreed to serve as a motor carrier and transport goods on behalf of Amark's customers. A copy of the Master Agreement is attached hereto as Exhibit A.

9.     Among other things, the Agreement:

- indicates that the carrier shall be liable for cargo loss or damage as a common carrier; and

- contains an attorney fees provision that awards reasonable attorney fees to the prevailing party if a party is required to pursue a legal remedy and/or incur expenses in order to force the other party to comply with the Master Agreement.

10.     Pursuant to the Master Agreement, UPS was engaged by Amark to transport five Supersacks of Kocide LLC's ("Kocide") ManKocide Copper Product (the "Goods" or "Supersacks") (EPA Reg. No. 91411-7) from Arkansas to California.

11     ManKocide Copper Product is a fungicide formulated to provide protection against fungal and bacterial diseases.

12.     On August 20, 2018, UPS obtained possession of the Goods from non-party, Kocide.

13.     Prior to the transport of the Goods and while in the care, custody and control of UPS, UPS penetrated the packaging of two out of the five Supersacks (*i.e.*, Goods), and caused the Goods to spill on the floor.

3

14.     As a result of UPS' improper care and handling of the Goods (*i.e.*, penetrating the packaging) and subsequent transfer of the Goods into the salvage containers, the Goods were no longer salable under Federal law.

15.     Due to the damage to the Goods, the Goods were refused by non-party, Vanguard Logistic Services ("Vanguard") at their original destination (*i.e.*, Compton, California) and returned to a UPS facility located in Commerce, California for further inspection.

16.     Once the Goods arrived at the UPS facility in Commerce, California, UPS deployed Ocean Blue Environmental Services, Inc., a hazardous materials response team ("HAZMAT Response Team"), to clean up the spilled material and repackage the damaged Goods into boxes.

17.     Despite the potential violations of state and federal law, neither Amark nor Kocide were notified of the damage to the Goods prior to UPS' deployment of the HAZMAT Response Team.

18.     Once the HAZMAT Response Team examined the damaged Goods, three (3) out of the five (5) Supersacks were redelivered to non-party, Vanguard, in Compton, California.

19.     The damaged Goods that were not redelivered (*i.e.*, the two torn Supersacks), were repackaged and required further evaluation in order to determine the full extent of the damage caused by UPS.

4

20.      Notably, UPS and/or the HAZMAT Response Team failed to: (1) maintain the original packaging of the damaged Goods; (2) properly repackage the damaged Goods; and (3) label the repackaged, damaged Goods in accordance with federal law.

21.      The repackaged Goods (*i.e.,* two damaged Supersacks), were transported to Blackhawk Warehouse & Leasing Co., located at 407 Phillips Road 311, Helena, Arkansas 72342, in order to allow an inspection company to further evaluate the extent of the damage to the Goods.

22.      On October 10, 2018, MTI Inspection Services performed an inspection of the damaged Goods and produced an Inspection Report of Lost or Damaged Merchandise, Report No. 846212 (the "Report"). A copy of MTI's inspection report is attached hereto as Exhibit B.

23.      The Report revealed, in pertinent part, that the original packaging of the Goods that were punctured and torn (by UPS), and that the Goods may be contaminated.

24.      However, MTI was unable to determine the full extent of the damage to the Goods because the original packaging was not present at the time of the inspection.

25.      Additionally, the (3) out of the five (5) Supersacks that were redelivered to non-party, Vanguard, in Compton, California were no longer able to be sold.

26.      According to non-party Kocide, the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), and the Environmental Protection Agency ("EPA"), all of the Goods were no longer useable because if a product differs in weight or composition, it could be misbranded under FIFRA section 2 (q)(1)(A) and/or 2 (q)(2)(C).

5

27.     Additionally, if foreign matter is introduced into the container the product could be adulterated and the sale would violate FIFRA section 12(a)(1)(E). The findings of the Report demonstrate that both have occurred in the present matter.

28.     Pursuant to Section 11 of the Master Agreement, Amark immediately filed a freight claim with UPS on 9/13/2018, with Claim No.: 1288881 and UPS Freight Pro No.: 69884612 (the "Claim").

29.     The Claim expressly advised UPS that the total value of the Goods is $21,835.58, and that the Goods were no longer usable.

30.     In support of its Claim, Amark also provided documentation from Kocide's Supply Chain Manager, which indicates that given the type of material that was shipped (i.e., the Goods), if any portion of the product is spilled or affected, then the entire Supersack is no longer saleable under Federal law.

31.     Despite acknowledging that it is responsible for the damage to the Goods and being provided documentation that demonstrates that the Goods are no longer salable, UPS has refused to pay the full amount of the loss.

32.     Rather, UPS only paid a portion of Amark's claim ($223.86 for 22kg) based upon the belief that the only damage that was incurred was relative to the material that was spilled.

33.     Prior to the commencement of this litigation, Amark issued a final demand letter dated April 12, 2019, to UPS requesting UPS to pay the full amount of the damaged Goods.

6

34.     Notwithstanding repeated requests to pay the full amount of loss, UPS has failed and refused to do so. Such failure continues to the present.

## COUNT I
### (Breach of Contract)

35.     Amark repeats and incorporates by reference Paragraphs 1 through 34 hereof for Paragraph 35 of Count I.

36.     The Master Agreement was entered into by and between Amark and UPS to transport the Goods on behalf of Amark.

37.     Amark has fully performed its obligations under the contract with UPS.

38.     At the time the Goods were tendered to UPS, such Goods were in good and acceptable condition.

39.     UPS breached the Master Agreement in that UPS failed to deliver the Goods to the destination in good order and condition, and failed to pay for the full amount of the damaged Goods.

40.     As a direct and proximate result of the breach of the Master Agreement referenced herein, Amark has been damaged in a principal amount of, at least, $21,835.58, plus interest. Also, in accordance with the Master Agreement, UPS is liable for the attorney fees and costs spent to recover the full amount of the loss.

## COUNT II
### (Violation of the Carmack Amendment)

41.     Amark repeats and incorporates by reference Paragraphs 1 through 40 hereof for Paragraph 41 of Count II.

7

42.     At all relevant times, UPS was engaged in the business or transporting property or goods for hire as a motor carrier in interstate commerce.

43.     Consequently, by failing to deliver the Goods to the shipping destination in the same order and condition as such Goods were received, UPS breached, failed and violated its duties and obligations as a motor carrier, for which UPS is liable under the Carmack Amendment, 49 U.S.C.A. § 14706, et seq., for Plaintiff's actual loss in an amount to be established at trial, but no less than $21,835.58, plus pre judgment and post judgment interest thereon, costs, expenses and attorneys' fees.

**COUNT III**
(Negligence)

44.     Amark repeats and incorporates by reference Paragraphs 1 through 43 hereof for Paragraph 44 of Count III.

45.     At all times during the shipment, the Goods were under the care, custody, and control of UPS.

46.     At all times during shipment, the Goods were to be maintained by UPS within a UPS' trailer or mode of transportation in a way to prevent damage.

47.     UPS had a duty to ensure the goods were transported in a manner in accordance with applicable industry standards for property similar to the Goods at issue.

48.     UPS failed to satisfy the above-described duty, causing damage to the Goods.

49.     UPS' failure to properly transport and deliver the Goods was the actual and proximate cause of Amark's damages in an amount no less than $21,835.58, plus interest

Electronically Filed 10/14/2019 14:30 / / CV 19 923257 / Confirmation Nbr. 1841679 / CLAJB

and reasonable attorney fees.

WHEREFORE, Plaintiff, Amark Logistics, Inc. requests judgment in its favor as follows:

1.  As to Counts I: against Defendant UPS Ground Freight, Inc., for breach of contract, in a principal amount of, at least, $21,835.58, together with interest thereon, plus reasonable attorney's fees as permitted by the Master Agreement;

2.  As to Count II: against Defendant UPS Ground Freight, Inc., for violation of the Carmack Amendment, in an amount exceeding $25,000.00 and to be determined at trial;

3.  As to Count III: against Defendant UPS Ground Freight, Inc., for negligence, in an amount exceeding $25,000.00 and to be determined at trial;

4.  As to All Counts: the costs and expenses incurred in prosecuting this action, reasonable attorney's fees, and such other relief, legal or equitable, that this Court deems suitable and proper.

Respectfully submitted,

/s/ Spencer E. Krebs
Eric J. Weis (0073066)
Spencer E. Krebs (0097414)
CAVITCH, FAMILO & DURKIN CO., LPA
1300 East Ninth Street, 20th Floor
Cleveland, Ohio 44114
Telephone:   (216) 621-7860
Email:         eweis@cavitch.com
                skrebs@cavitch.com

*Attorneys for Plaintiff Amark Logistics, Inc.*

9

## JURY DEMAND

Plaintiff demands that this case be tried before a jury of the maximum number allowed by law.

/s/ Spencer E. Krebs
Spencer E. Krebs (0097414)

# EXHIBIT A

Electronically Filed 10/14/2019 14:30 / / CV 19 923257 / Confirmation Nbr. 1841679 / CLAJB

Contract #81583
Effective Date: 7/8/13

## BROKER / CARRIER MASTER TRANSPORTATION AGREEMENT

This Master Transportation Agreement (this "Agreement") is made and entered into as of this __8__ day of __ _JULY_ _____, 20 _13_, by and between UPS Ground Freight, Inc., d/b/a UPS Freight, with its principal place of business located at 1000 Semmes Avenue, Richmond, VA 23224 (hereinafter referred to as "Carrier"), and _AMARK LOGISTICS INC_____, with its principal place of business located at _28915 CLEMENS ROAD # 105 WESTLAKE, OH 44145_ (hereinafter referred to as "Broker").

### RECITALS

A. _Amark Logistics Inc_Broker is a third party logistics provider company providing transportation management services for its customers (collectively referred to as "Broker's customers" and individually as "Broker's customer"), which includes arranging the transportation of property by authorized motor carriers. Broker is licensed transportation services broker, authorized by the USDOT, via permit _204995_.

B. Carrier is a motor carrier, authorized by the USDOT, via permit MC-109533, sub 140-P, issued by the USDOT, to transport property in interstate, intrastate and foreign commerce.

C. Broker desires to arrange transportation by Carrier for certain of Broker's customers between designated shipping points shown as being served direct by Carrier in Carrier's service directory (and other such points as may be agreed to from time to time). These arrangements are listed in the Transportation Schedules attached and made a part of this agreement (the "Transportation Schedules").

NOW, THEREFORE, for and in consideration of the mutual promises and covenants contained herein, the parties hereto do hereby agree as follows:

1. **SERVICE AND CARRIER'S PERMIT:** Carrier shall, as motor carrier and independent contractor, and not as an agent or employee of Broker or any Broker's customer, transport shipments for certain Broker's customers between points in the United States as authorized in Carrier's permit, to the extent and under the rates, charges and other provisions set forth in this Agreement.

2. **TRAFFIC TO BE TENDERED:** During the term of this Agreement, Broker shall tender to Carrier or caused to be tendered to Carrier, and Carrier shall accept, a series of shipments of enough property to produce a monthly average of One Thousand and No/100 Dollars ($1,000.00) in net revenue for Carrier. In the event this minimum is not met at any time, Carrier shall be entitled to terminate this Agreement with immediate effect.

3. **TERM:** This Agreement shall be effective on the date first shown above, and shall continue in effect for a period of twelve (12) months and month to month thereafter; provided, however, that either party may terminate this Agreement or any Transportation Schedule at any time, with or without cause, by giving the other party not less than thirty (30) days prior written notice of termination or as otherwise agreed by the parties.

4. **REPRESENTATION AND WARRANTY:** Broker hereby represents and warrants to Carrier that it has the power and authority to act on behalf of each Broker's customer and that all information provided by Broker to Carrier hereunder is accurate and complete. Broker shall indemnify, defend, and hold Carrier harmless from any and all claims, actions, damages, costs, losses, and expenses (including without limitation attorneys' fees and court costs) arising out of or resulting from any breach of this representation and warranty. Carrier shall retain the right to request Broker to furnish Carrier a letter of authority from any Broker's customer providing proof that the Broker's customer has granted Broker the authority to negotiate price, terms and conditions on their behalf.

5. **ACCEPTANCE, TERMINATION AND NON-SOLICITATION OF CUSTOMERS**
   (a) Carrier has sole discretion to determine if a Broker's customer is appropriate under this Agreement and Carrier has the right to refuse any account and/or Broker's customer that it deems not appropriate. This includes, but is not limited to, existing customers of Carrier and any customers who are affiliated with another Broker, third party logistics provider or broker under contract with Carrier. None of the customers of Broker shall be deemed to be a customer to which this Agreement is applicable unless and until approved and accepted in writing by Carrier and incorporated into a Transportation Schedule signed by Carrier and Broker which references and is incorporated into this Agreement.

Electronically Filed 10/14/2019 14:30 / / CV 19 923257 / Confirmation Nbr. 1841679 / CLAJB

Contract #81583
Effective Date: 7/8/13

(b)    Broker agrees not to actively solicit any customer of Carrier without approval of Carrier. Carrier agrees not to actively solicit any customer of Broker without approval of the Broker. Both Carrier and Broker agree to put appropriate processes, training and communications in place to prevent this. It is permissible for Carrier to discuss service-related issues with the customer as needed. Carrier and Broker agree to communicate, as quickly as possible, to each other, any breach of this section and agree to work together to resolve the issue.

(c)    Once a Broker's customer is accepted by Carrier under this Agreement, Carrier will not accept or provide pricing to that customer from another third party logistics provider unless Broker authorizes Carrier to do so.

(d)    Upon termination of this Agreement either in whole or with regard to a specific customer, either party has the right to pursue a relationship with that customer.

6.    **RATES AND CHARGES:**

(a)    In consideration of services provided by Carrier, Carrier shall be compensated by Broker (or its customer, if applicable) according to the rates, charges, terms and conditions set forth in this Agreement.

(b)    The rates and charges included under this Agreement and any Transportation Schedule hereunder (the "Rates") are considered Confidential Information under section 16 and apply only to shipments made directly with Carrier by Broker, its authorized agents or franchisee on behalf of Broker. The Rates may not be disseminated, shared with, offered to be used by any entity other than through the Broker. Broker's agents or franchisees may not offer the Rates in their own name or any other third party without the prior written consent of Carrier in each instance. Any attempts to do so will entitle Carrier to terminate this Agreement or and Transportation Schedule with immediate effect.

7.    **PAYMENTS OF CHARGES:** Payment for the services provided by Carrier under this Agreement shall be made by Broker to Carrier (or by a customer to Carrier if so noted in the applicable Transportation Schedule) within fifteen (15) days of Carrier's invoice date. Notwithstanding the foregoing or anything else in this Agreement to the contrary, Broker agrees that (i) in providing services under this Agreement, Carrier will be relying on the credit of Broker's customers and that Carrier will ultimately look to Broker's customer for the payment of all charges due for its shipments made in the event such charges are not paid by Broker and (ii) Broker will be jointly and severally liable with each Broker's customer for payment of freight charges incurred in connection with services rendered by Carrier on behalf of such Broker's customer under this Agreement. Broker further agrees that all monies collected by Broker for transportation services provided are the property of Carrier, and that Broker will promptly remit such monies to Carrier in accordance with the rates and charges agreed to and made a part of this Agreement without deductions or offsets.

8.    **COLLECTION:** In the event Carrier must employ the services of a collection agency or attorney, Carrier will be entitled to a collection fee of 35% of the unpaid charges and a service charge of 1.5% per month on the unpaid balance. If after notice to Broker or Broker's customer, any delinquent amounts are not paid in full, Carrier may refuse to accept further shipments for or on behalf of such Broker's customer and may terminate this Agreement or any Transportation Schedule immediately.

9.    **APPLICATION OF BILL OF LADING:** To the extent that the terms and conditions contained in the Uniform Straight Bill of Lading published in Carrier's tariffs (the "USBL") are not inconsistent with the terms and conditions of this Agreement, the terms and conditions of the USBL shall govern the rights and responsibilities of the parties with respect to the transportation of shipments hereunder. Non-conforming bills of lading used by the parties shall be for receipt of the goods only and for freight movement. Any terms shown on any non-conforming bill of lading form are void in lieu of the USBL terms and conditions. Broker shall ensure the bill of lading used in connection with any shipment under this Agreement is accurate regarding freight descriptions and shall show the payer or "bill to" party on the bill of lading as the customer c/o ("in care of") Broker where Broker is acting as paying agent.

10.    **NON-APPLICATION:** The provisions of this Agreement shall not apply to shipments of: (1) hazardous wastes that require or are accompanied by an Environmental Protection Agency (EPA) or state Hazardous Waste Manifest; (2) household goods as defined by the USDOT; (3) Classes A & B explosives; (4) commodities in bulk; (5) livestock; (6) poultry; (7) articles which cannot be loaded inside a van trailer; (8) articles of unusual value; (9) commodities requiring special equipment; (10) commodities which are or could be injurious or contaminating to other freight, of (11) other commodities identified in Carriers 102 Series Rules Tariff as prohibited or restricted articles. Carrier shall have the right to refuse to accept, handle, or transport any goods that Carrier reasonably determines are not safe for handling or transportation.

Electronically Filed 10/14/2019 14:30 / / CV 19 923257 / Confirmation Nbr. 1841679 / CLAJB

Contract #81583
Effective Date: 7/8/13

11. **CLAIMS:** Broker or customer shall immediately notify Carrier upon the discovery of any loss of, or damage to, property transported by Carrier under this Agreement. All claims for loss of or damage to property transported by Carrier must be filed with and received by Carrier within nine (9) months following delivery (or attempted delivery in the case of refused shipments), except that claims for failure to make delivery must be filed within nine (9) months after a reasonable time for delivery has elapsed, and the failure to file a claim within the applicable time period shall forever bar recovery of the claim.

Any civil lawsuit on account of a claim for loss, damage, injury or delay shall be instituted against Carrier not later than two (2) years and one (1) day from the day when written notice is given by Carrier to the claimant that Carrier has disallowed the claim or any part or parts of the claim stated in such notice, and the failure to file a claim within the applicable time period shall forever bar the institution of any such lawsuit. Claims shall be handled pursuant to Principles and Practices for the Investigation and Disposition of Freight Claims as set forth in 49 CFR Part 370.

12. **LOSS OR DAMAGE AND CARRIER LIABILITY:** Carrier shall be liable for cargo loss or damage as a common carrier as set forth under Title 49 of the United States Code Section 14706 subject to the liability provisions and limits in Carrier's Tariff UPGF 102 series in effect at the time of the shipment.

13. **OVERCHARGES AND UNDERCHARGES:** Any action by Carrier to recover undercharges in connection with services rendered by Carrier, and any action by Broker or any Broker's customer to recover alleged overcharges in connection with services rendered by Carrier under this Agreement, shall be commenced not more than 180 days after the date of Carrier's invoice in connection with the shipment with respect to which such undercharges or overcharges are claimed. To the extent permitted by applicable law, the expiration of the said 180-day period shall be a complete and absolute defense to any such action, without regard to any mitigating or extenuating circumstance or excuse whatsoever, unless the party named as defendant in any such action has expressly agreed in writing to waive such defense in whole or in part. The provisions of this paragraph shall survive the termination, expiration or cancellation of this Agreement.

14. **INSURANCE:** Carrier shall keep in force and effect insurance policies in amounts required by the USDOT or other governing agencies regulating the business of motor carriers.

15. **INDEMNIFICATION:** Carrier shall indemnify and hold Broker and Broker's customer harmless from and against any and all claims from personal injury (including death) to any person arising out of the negligence or willful misconduct of Carrier. Broker and Broker's customer shall indemnify and hold Carrier harmless from and against any and all claims from personal injury (including death) to any person arising out of the negligence or willful misconduct of Broker and/or Broker's customer.

16. **CONFIDENTIALITY:** Each party shall consider all information regarding this Agreement and the services provided hereunder confidential and proprietary and shall not disclose any such information to any other party or use such information other than in connection with the performance of this Agreement without the prior written approval of the other party. Notwithstanding the foregoing, Carrier may disclose such information to its parent and affiliate companies and its contractors and agents, provided each agrees to maintain the confidentiality of such information. Each party acknowledges that in the event of an unauthorized disclosure, the damages incurred by the non-disclosing party may be difficult if not impossible to ascertain, and that the non-disclosing party may seek injunctive relief as well as any other remedy available at law or in equity.

17. **EXCUSABLE NON-PERFORMANCE OR LEGAL RESTRAINT:** Except for any obligation to make payments hereunder, neither Broker, Broker's customer, nor Carrier shall be held liable for any loss, damage, delay or failure to perform any of the terms and provisions of this Agreement resulting from any cause beyond the reasonable control of any party, including without limitation, acts of God, fires, strikes, labor disturbances, equipment shortages, federal and state legislation or regulation, riot, war, weather conditions, acts of the public enemy, acts of terrorism, local or national disruptions to the transportation networks or operations, fuel shortages, governmental request or requisition for national defense, and provided that the applicable cause is not attributable to the acts or omissions of such party, and such party is taking reasonable measures to remove or mitigate the effects of the applicable cause.

18. **NON-ASSIGNABILITY:** This Agreement shall not be transferred, assigned or subcontracted, in whole or in part, either voluntarily or by operation of law, by Broker or Carrier without the advance written approval of the other party, and any attempted transfer, assignment, or subcontracting without such approval shall be null and void.

UPS Ground Freight, Inc d/b/a UPS Freight          Page 3 of 5          Broker / Carrier Master-Transportation Agreement
Revised: February 13, 2013                                                                                      OTC-571

Contract #81583
Effective Date: 7/8/13

19.    **WAIVER:** Failure of either party to exercise any option, right or privilege hereunder, or to demand compliance as to any obligation or covenant of the other party, shall not constitute a waiver of any such right, privilege or option, or impair the right of such party to exercise any such option, right, or privilege or demand the strict performance hereof unless such waiver is evidenced by properly executed instrument.

20.    **NOTICES:**

a) All notices required under this Agreement shall be deemed to be properly served only if reduced to writing and sent by United States mail, certified, return receipt requested, postage prepaid, or by UPS Next Day Air®, fees prepaid, or by personal delivery. The date of any notice so sent will be deemed to be the date of receipt. If any notice mailed or sent by United States mail or by UPS Next Day Air® delivery service is properly addressed with appropriate charges prepaid but is returned because the intended recipient refuses delivery or can no longer be found at the current notice address, such notice shall be deemed effective notice and to be given on the date such delivery is refused or cannot be accomplished. All such notices shall be sent to the respective address of the party set forth below, unless notice of another address is given to the party sending such notice in compliance with the provisions hereof.

| Broker | Carrier |
|---|---|
| _AMARK LOGISTICS INC_ | UPS Freight |
| Attn: _RICK KEANE_ | Attn:  Contract Administration |
| _28915 CLEMENS RD #105_ | 1000 Semmes Avenue |
| _WESTLAKE, OH_ | Richmond, VA 23224 |

b)    When time is of the essence and SHIPPER and Carrier agree that a facsimile transmission of any document shall have the same effect as an original, documents may be faxed to:

| Broker | Carrier |
|---|---|
| _AMARK LOGISTICS INC_ | UPS Freight |
| _877·421·3919_ | (804) 231-8540 |

21.    **ATTORNEYS FEES:** If it shall be necessary for either party hereto to hire and/or retain legal counsel, pursue any legal remedy, or incur any other expense in order to force the other to comply with and/or perform any of the provisions, conditions, and/or covenants of this Agreement, then the prevailing party shall be reimbursed by the other for the entire reasonable customary costs thereof, and such obligation shall be deemed to have accrued on the date of the commencement of any action and to be enforceable whether or not the action is prosecuted to judgment.

22.    **UPS MARKS:** Broker acknowledges and agrees that Broker has no right, title, or interest in or to any intellectual property, including without limitation any service marks, trademarks, names, copyrights, designs, and/or logos, of Carrier and/or any of Carrier's affiliate, subsidiary, or parent companies (the "UPS Marks"), and that nothing in this Agreement shall be construed as an assignment or grant to Broker of any right, title, or interest in or to any of the UPS Marks. In the event Carrier shall determine, in its sole discretion, that Broker is using any of the UPS Marks other than as authorized by Carrier, it shall immediately, upon the request of Carrier, cease such non-conforming use of the UPS Marks. Broker acknowledges that use of UPS Marks without the express written permission of Carrier may cause irreparable harm for which damages at law may not be an adequate remedy, and Broker agrees that the provisions of this Agreement prohibiting use hereof may be specifically enforced by a court of competent jurisdiction. Therefore, upon any actual or impending violation of this Agreement concerning UPS Marks, Broker consents to the issuance by any court of competent jurisdiction of a restraining order or other injunction, without bond, restraining or enjoining such violation by Broker or any entity or person acting in concert with Broker. The provisions of this Section shall survive the expiration or termination of this Agreement for any reason.

Contract #81583
Effective Date: 7/8/13

23.    MISCELLANEOUS:

(a)    This Agreement constitutes the entire agreement between the parties, and supersedes all prior or contemporaneous agreements, conversations, memoranda, or understandings of the parties, verbal or written, relating to the subject matter hereof.

(b)    The headings and captions in this Agreement are for convenience of the parties in identification of the several provisions and shall not constitute a part of this Agreement nor be considered interpretive thereof.

(c)    Any duty to indemnify set forth in this Agreement shall survive the termination or expiration of this Agreement.

(d)    Neither this Agreement nor any term or provision of this Agreement shall be terminated, amended, altered, or modified except by a written instrument signed by duly authorized representatives of Broker and Carrier.

(e)    The language in all parts of this Agreement shall be construed simply according to its fair meaning and not strictly for or against any of the parties, including without limitation the drafter.

(f)    If any part of this Agreement shall be deemed to be invalid or unenforceable, that part shall be ineffective to the extent of such invalidity only, without in any way affecting the remaining parts of that provision or the remaining parts of this Agreement.

24.    GOVERNING LAW: It is the intention of the parties that the provisions of this Agreement shall be construed and enforced according to the laws of the Commonwealth of Virginia, without regard to choice of law principles, to the extent that such laws are not inconsistent with the federal or state regulatory laws applicable to the transportation services provided by Carrier hereunder.

IN WITNESS WHEREOF, Carrier and Broker have each caused this Agreement to be executed by their duly authorized representatives, effective on the date first shown above.

"Broker"

AMARK LOGISTICS INC.

By: _Richard J Keane_

Print Name: _RICHARD J. KEANE_

Title: _DIRECTOR OF OPERATIONS_

"Carrier"

UPS Freight

By: _____

Print Name: _Richard A. Koch_

Title: _Manager, Contracts_

UPS Ground Freight, Inc d/b/a UPS Freight
Revised: February 13, 2013

Page 5 of 5

Broker / Carrier Master Transportation Agreement
OTC-571

# EXHIBIT B

## MTI INSPECTION SERVICES
### INSPECTION REPORT OF LOST OR DAMAGED MERCHANDISE

**846212**

| | | | |
|---|---|---|---|
| CARRIER: | UPS FREIGHT | TERMINAL: | RICHMOND |
| BILL DATE: | 8/31/18 Exception noted upon delivery? Yes | PRO/BILL NO: | 698846212 |
| CONSIGNEE: | BLACKHAWK WAREHOUSE | ADDRESS: | 407 PHILLIPS ROAD 311, HELENA, AR |
| SHIPPER: | VANGUARD | ORIGIN: | EAST RANCHO DOMINGUEZ, CA |
| BILL DESCRIPTION: | FUNGICIDE | RELEASED RATE/VALUE: | |
| RATE BASIS: | DISTANCE - 204 MILES ROUND TRIP | RATE AUTHORITY: | JENNIFER NUCKLES |
| DATE DELIVERED: | NOT AVAILABLE | DATE ASSIGNED TO MTI: 10/10/18 | DATE INSPECTED: 10/11/18 |

Is the shipper the manufacturer? No  SHIPPER RETURNED TO WAREHOUSE

If articles imported or trans-shipped, have contents been inspected by shipper prior to this movement? --

Alleged Loss/Damage: Damage          Damage Type: Indeterminable

Does damage to container correspond to damage to contents? --

Corresponding damage indeterminable details:

Package description and condition: THE ORIGINAL PACKAGING WAS NOT AVAILABLE AT THE TIME OF THIS INSPECTION. THIS LACK OF PACKAGING MADE IT IMPOSSIBLE TO DETERMINE WHETHER THE DAMAGE TO THE PACKAGING, IF ANY, CORRESPONDED TO ANY DAMAGE TO THE ARTICLE BEING INSPECTED OR IF THE PACKAGING EMPLOYED WAS ADEQUATE TO PROTECT THE ARTICLE DURING THE RIGORS OF NORMAL TRANSPORTATION AND HANDLING.

UNITS PACKED IN TWO TW CORRUGATED FIBERBOARD CARTONS, GLUED, MEASURING 36"x 36"x 36", SETTING ON TWO WOODEN PALLETS MEASURING 37"x 37". INNER PACKAGING CONSISTED OF A PLASTIC BAG SURROUNDING THE PRODUCT. ONE CARTON WAS PUNCTURED AND TORN ON ONE OF THE UPPER HORIZONTAL EDGES APPROXIMATELY 4' IN LENGTH. THERE WAS NO PRODUCT DESCRIPTION ON THE CONTAINERS. CONSIGNEE STATED THAT THE PRODUCT WAS MANKOCIDE FUNGICIDE.

Movement of shipment after delivery? 407 PHILLIPS ROAD 311, HELENA, AR

Location of inspection: 407 PHILLIPS ROAD 311, HELENA, AR

| | | | |
|---|---|---|---|
| Shipping Container: | New | Corrugated | Triple Wall |
| Box Maker Info: | | | |
| Palletization/Crating: | Pallet | | |
| Closures: | Glued | | |
| Markings: | None | | |
| Inner Packaging: | | | |
| | Other | PLASTIC BAG | |
| Bag: | | | |
| Crate: | | | |
| Drum: | | | |

| Number of Articles: | Commodity: | Cost of Articles: | Invoice No. | Model No. | Serial No. |
|---|---|---|---|---|---|
| 4,400 LBS | New | 21,835 (Actual) | | SEE BELOW | SEE BELOW |

4,400 LBS, COMMERCIAL/AGRICULTURAL FUNGICIDE, DUPONT, MANKOCIDE, NO BATCH NUMBER LISTED, NO LOT NUMBER LISTED, MEASURING APPROXIMATELY 36"x 36"x 36" (IN BULK), COLOR: GREEN.

FOUND NO VISIBLE DAMAGE TO THE CONTENTS OF THE CONTAINERS. COULD NOT DETERMINE IF ANY PRODUCT WAS LOST DURING REPACKAGING. POSSIBLE CONTAMINATION WITH DIRT OR OTHER FOREIGN MATTER IF SOME OF THE PRODUCT WAS SPILLED AND REPLACED IN THE CONTAINERS.

DISPOSITION HAD NOT BEEN DETERMINED AT THE TIME OF THIS INSPECTION.

CONSIGNEE: NANCY - NANCYM@BLACKHAWK-WAREHOUSE.COM
INSPECTOR: Roberts, Tim - memphis@mtiservices.com - (817) 868-7000
THIS INSPECTION REPORT IS NOT A CLAIM. GOODS MUST BE RETAINED PENDING CARRIER DISPOSITION

This inspector agrees to use his/her best skill and knowledge on behalf of those who requested his inspection. However, this report is issued subject to the following stipulation. It is agreed and understood by all parties that neither MTI or any inspector thereof shall be every liability for any amount in excess of the actual cost of this inspection report.